**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal No.  07-041 (RJL)** |
| | ) | |
| **KENNETH KEITT** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT KENNETH KEITT'S FIRST MOTION TO COMPEL
EXCULPATORY INFORMATION AND INCORPORATED
<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>**

Defendant Kenneth Keitt, by and through undersigned counsel, respectfully moves this Court for an Order compelling the United States of America to:  (1) inform him whether Wilhelm DerMinassian lawfully accepted $10,544.99 in repairs to one of the high-end sport utility vehicles referenced in the government's March 27, 2007 letter to Mr. Keitt's attorney; (2) produce all notes relating to the September 19, 2006 interview of Wilhelm Derminassian; and (3) provide the identities of all persons who were present during Wilhelm DerMinassian's September 19, 2006 interview.  In support of this motion, Mr. Keitt submits the following.

**I.  <u>Mr. Keitt's October 8, 2007 Discovery Request</u>**

The following discovery request, pursuant to *Brady v. Maryland,* 373 U.S. 83 (1963), was memorialized in an October 6, 2007 letter to the government's attorney, John Terzaken, Esquire.  *See* Exhibit 1.

> In your, March 27, 2007 letter, you wrote, in part, the following:
>
> Further, the United States discloses that Mr. DerMinassian was interviewed on September 19, 2006.  In the interview, Mr. DerMinassian stated that, in 2002, DMJM+Harris, Inc., purchased two, high-end sport utility vehicles for use by the Traffic Services Administration pursuant to requirements of the Operational

> Support Contract, D.C. Formal Agreement No. 014-98, and **not as a favor to Mr. DerMinassian.**

(Emphasis added).

> On April 21, 2005, Mr. DerMinassian entered a plea of guilty pursuant to an Information, where the Government charged, in part, that:

> It was part of the scheme that from approximately October 2001 through October 2002 the Defendant solicited and accepted approximately $20,000 in cash and other items of value from Company A, through Persons A-1 and A-2, in connection with the Operational Support contract, including:

> A. on or about October 2, 2001 the Defendant solicited and accepted $2,500 in cash;

> B. on or about October 26, 2001 the Defendant solicited and accepted $4,400 in cash;

> C. on or about April 30, 2002 the Defendant solicited and accepted $300 in cash; and

> D. **on or about September 27, 2002 the Defendant solicited and accepted $10,544.99 in vehicle repair services.**

> Information, at ¶ 6 (emphasis added).[1]  Is it the Government's position now that Mr. DerMinassian lawfully accepted $10,544.99 in repairs to one of the high-end sport utility vehicles referenced in your March 27, 2007 letter?  We submit that Mr. Keitt is entitled to this information pursuant to Brady v. Maryland, 373 U.S. 83 (1963).  Finally, for the reasons cited in the previous sentence and the prior paragraph, please provide all reports and notes memorializing the Government's September 26, 2006[2] interview with Mr. DerMinassian.

By letter dated October 12, 2007, the government replied to this request as follows:

---

[1]Mr. DerMinassian's Information is attached hereto at Exhibit 2.

[2]In his October 6, 2007 letter, undersigned counsel mistakenly referred to the DerMinassian interview as having occurred on September 26, 2006.

2

I am writing in response to your letter of October 6, 2007, in which you asked the United States to respond in writing to three requests for information: (i) a request for any rough notes taken during interviews conducted by the United States, as well as an inventory of any such notes; **(ii) a request for the United States' position on certain charges brought in the case of *United States v. Wilhelm DerMinassian*, Criminal No. 05-127 (RMC) (D.D.C); and (iii) a request for any notes or reports of a September 26, 2006 interview of Wilhelm DerMinassian. On March 27, 2007, the United States produced and/or made available to your client all of the discovery to which he is entitled pursuant to Federal Rules of Criminal Procedure 16 and 26.2, 18 U.S.C. § 3500, and *Brady v. Maryland*, 373 U.S. 83 (1963), *United States v. Giglio*, 405 U.S. 150 (1972), and their progeny. Accordingly, the United States respectfully denies each of your requests.**

*See* Exhibit 3 (emphasis added).

## II. <u>Argument</u>

Mr. Keitt asks this Court to order the government to directly answer the question put to Mr. Terzaken on October 6, 2007. The government has now admitted that DMJM+Harris, Inc. purchased two vehicles for use by the Traffic Services Administration, pursuant to the Operational Support Contract, D.C. Formal Agreement No. 014-98. *See* Exhibit 1(quoting Government's March 27, 2007 letter). That contract provides, in relevant part, that:

<u>Sec. 5. Transportation.</u> The Consultant shall supply eight (8) vehicles to support communications and field equipment maintenance and traffic engineering investigations. The fleet of vehicles shall include five (5) **fully equipped general purpose vehicles**, two (2) bucket trucks, and one (1) lift truck. The lift truck and bucket trucks shall be delivered with a full complement of equipment to support the program. The Consultant shall purchase or lease the vehicles at the commencement of the contract. **One or more of the vehicles shall be made available for use by the District personnel at the request of TSSD. The Consultant shall maintain each vehicle in good repair and fully operational condition for the full extent of the agreement. Vehicles shall be replaced as necessary in order to maintain reliable operation. The Consultant shall be responsible for fuel, maintenance and insurance costs for the duration of the agreement. All vehicles shall be insured by the Consultant to cover usage by TSSD employees.**

*See* Exhibit 4 (emphasis added).  How can it be -- especially given that Mr. DerMinassian **now** admits that Mr. Keitt's company lawfully purchased the vehicle referenced in his Information at ¶ 6, Part D -- that Mr. DerMinassian could have illegally solicited and accepted $10,544.99 to repair this vehicle?  The contract specifically provides that Mr. Keitt's company was not only required to purchase the vehicle, but also to insure this vehicle and to maintain this and every other vehicle in good repair.  *See* Exhibit 4.

The government cannot remain vague on this point.  It cannot fulfill its obligations by claiming full discovery has been provided.  The government must specifically identify and/or provide the exculpatory material requested.  *See United States v. Hsia,* 24 F.Supp.2d 14, 29 (D.D.C. 1998)("[O]pen-file discovery does not relieve the government of its *Brady* obligations. The government cannot meet its *Brady* obligations by providing [thousands of] documents and then claiming that [the defendant] should have been able to find the exculpatory information in the haystack. To the extent that the government knows of any documents or statements that constitute *Brady* material, it must identify that material….").

If the prosecutor still somehow believes that Mr. DerMinassian illegally solicited and accepted $10,544.99 in vehicle repair services, then he must explain how this is so.  If, on the other hand, our reading of the evidence is correct, then the government must identify this as *Brady* evidence.

In *United States v. Safavian,* the Honorable Paul Friedman offered the following definition of *Brady* information.

> It is any information in the possession of the government – broadly defined to include all Executive Branch agencies – that relates to guilt or punishment and that tends to help the defense by either bolstering the defense case or impeaching

> potential prosecution witnesses. It covers both exculpatory and impeachment evidence. The government is obligated to disclose all evidence relating to guilt or punishment which might be reasonably considered favorable to the defendant's case, that is, all favorable evidence that is itself admissible or that is likely to lead to favorable evidence that would be admissible, or that could be used to impeach a prosecution witness. Where doubt exists as to the usefulness of the evidence to the defendant, the government must resolve all such doubts in favor of full disclosure.

233 F.R.D. 12, 15-16 (D.D.C. 2005). Certainly, the information requested by Mr. Keitt fails within this or any other objective definition of *Brady* evidence.

Undersigned counsel understands, through a conversation with Mr. Terzaken, that no interview memorandum was created following the September 19, 2006 interview of Mr. DerMinassian. Therefore, in addition to the information requested above, Mr. Keitt requests the identities of all persons present for this interview and all notes relating to this interview. *See Chavis v. State of North Carolina,* 637 F.2d 213, 223 (4th Cir. 1980)(Failure to produce statement edited by the prosecutor violated the defendant's due process rights); *see also United States v. Bishton,* 463 F.2d 887, 893 (D.C. Cir. 1972)(prosecutors violated *Brady* by unduly delaying production of information which tended to discredit testimony of chief cooperating witness); *United States v. Tarantino*, 846 F.2d 1384, 1414 n. 11 (D.C.Cir.1988)(limitations on discovery in Jencks Act do not lessen *Brady* obligations); *United States v. Haldeman*, 559 F.2d 31, 77-78 & n. 112 (D.C.Cir.1976); *United States v. Ramirez*, 54 F.Supp.2d 25, 32-33 (D.D.C.1999); *United States v. Trie*, 21 F.Supp.2d 7, 23 (D.D.C. 1998); *United States v. Poindexter*, 727 F.Supp. 1470, 1485 (D.D.C. 1989)("*Brady* obligations are not modified merely because they happen to arise in the context of witness statements.").

Mr. Keitt is entitled to know whether Mr. DerMinassian lawfully accepted $10,544.99 in repairs to one of the high-end sport utility vehicles referenced in the government's March 27,

2007 letter.  Mr. Keitt is also entitled to the notes relating to the September 19, 2006 interview of Mr. Derminassian, during which he admitted to providing false information regarding the purchase of this and another vehicle.  Finally, Mr. Keitt is entitled to learn the identities of all persons who were present during Mr. DerMinassian's September 19, 2006 interview, so he may seek to interview these potential witnesses.

WHEREFORE, for the foregoing reasons, and any others that may appear to the Court, Mr. Keitt requests the Court to grant the instant motion.

Respectfully submitted,


_____/s/_____
STEVEN J. McCOOL
D.C. Bar No. 429369
MALLON & McCOOL, LLC
1776 K Street, N.W., Suite 200
Washington, D.C. 20006
(202) 393-7088

Counsel for Kenneth Keitt

6

## **CERTIFICATE OF GOOD FAITH**

Undersigned counsel certifies to this Court that *bona fide* attempts were made to obtain the material described in this motion.  Defendant's letter requesting this information and the government's response are attached to this motion.  *See* Exhibits 1 and 3.


_____/s/_____
STEVEN J. McCOOL

**CERTIFICATE OF SERVICE**

I hereby certify that on the 2nd day of November 2007, the foregoing Defendant's First

Motion to Compel Exculpatory Evidence, Incorporated Memorandum of Points and Authorities

and the attached proposed Order were served by electronic filing upon:

John Terzaken
Mark Pletcher
U.S. Department of Justice
Antitrust Division
1401 H Street, N.W., Suite 3700
Washington, D.C.  20530


_____/s/_____
STEVEN J. McCOOL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal No.  07-041 (RJL)** |
| | ) | |
| **KENNETH KEITT** | ) | |
| | ) | |
| **Defendant.** | ) | |

### ORDER

Upon consideration of Defendant Kenneth Keitt's Motion to Compel Exculpatory Information, Incorporated Memorandum of Points and Authorities, the government's response thereto, and the entire record in this matter, it is this _____ day of November 2007, hereby

**ORDERED**, that Defendant Keitt's motion is granted; and it is further

**ORDERED**, that, on or before November 22, 2007, the government shall:

(1) Provide to Kenneth Keitt's counsel, a written response to the following:  Did Mr. DerMinassian lawfully accepted $10,544.99 in repairs to one of the high-end sport utility vehicles referenced in the Information to which he pled guilty?  If the government answers in the affirmative, it shall provide a written explanation for this position.

(2) Provide to Kenneth Keitt's counsel, all notes relating to the September 19, 2006 interview of Wilhelm Derminassian.

(3) Provide to Kenneth Keitt's counsel, the identities of all persons who were present during Wilhelm DerMinassian's September 19, 2006 interview.

_____
THE HONORABLE RICHARD J. LEON
UNITED STATES DISTRICT COURT JUDGE

# MALLON & McCOOL, LLC

1776 K STREET, N.W., SUITE 200
WASHINGTON, D.C. 20006

Tel: 202-393-7088                                                    Fax: 202-293-3499

October 6, 2007

**VIA ELECTRONIC TRANSMISSION ONLY**

John Terzaken, Esquire
United States Department of Justice
Antitrust Division
1401 H Street, N.W., Suite 3700
Washington, D.C. 20530

      Re:    <u>United States v. Kenneth Keitt</u>, Criminal Case No. 07-041

Dear Mr. Terzaken:

I am writing to request discovery of information in the above-captioned case, pursuant to Rule 16 of the Federal Rules of Criminal Procedure and other applicable authority referenced below. Please provide the requested information at your earliest convenience.

I would greatly appreciate it if you would respond to each request separately? fully, and in writing. If there are any documents or information responsive to any of the following requests which you refuse to produce, please define or designate the documents or information in your response with sufficient particularity to allow us to make a motion for a court order to require production of these documents or information.

1. Please prepare and produce an inventory along with all rough notes taken with respect to any witness interviewed by the Government, including the time, place, participants and other circumstances relating to when the rough notes were prepared. In support of this request, I note that it has been recognized that rough interview notes should be maintained in order to preserve all evidence that is potentially favorable to a defendant and disclosable under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and to protect Mr. Keitt's right to disclosure of statements under the Jencks Act, 18 U.S.C. §3500. <u>See</u> <u>e.g.</u>, <u>United States v. Harrison</u>, 524 F.2d 421 (D.C. Cir. 1975). Given that the Government has recognized an open file in this matter, we ask you to produce these notes along with the inventory at your first opportunity.

2. In your, March 27, 2007 letter, you wrote, in part, the following:

Further, the United States discloses that Mr. DerMinassian was interviewed on September 19, 2006. In the interview, Mr. DerMinassian stated that, in 2002, DMJM+Harris, Inc., purchased two, high-end sport



EXHIBIT

1

John Terzaken, Esquire
United States Department of Justice
October 8, 2007
Page 2

> utility vehicles for use by the Traffic Services Administration pursuant to
> requirements of the Operational. Support Contract, D.C. Formal.
> Agreement No. 014-98, and not as a favor to Mr. DerMinassian.

On April 21, 2005, Mr. DerMinassian entered a plea of guilty pursuant to an Information, where the Government charged, in part, that:

> It was part of the scheme that from approximately October 2001 through October 2002 the Defendant solicited and accepted approximately $20,000 in cash and other items of value from Company A, through Persons A-1 and A-2, in connection with the Operational Support contract, including:

A. on or about October 2, 2001 the Defendant solicited and accepted $2,500 in cash;

B. on or about October 26, 2001 the Defendant solicited and accepted $4,400 in cash;

C. on or about April 30, 2002 the Defendant solicited and accepted $300 in cash; and

D. **on or about September 27, 2002 the Defendant solicited and accepted $10,544.99 in vehicle repair services.**

Information, at ¶ 6 (emphasis added). Is it the Government's position now that Mr. DerMinassian lawfully accepted $10,544.99 in repairs to one of the high-end sport utility vehicles referenced in your March 27, 2007 letter? We submit that Mr. Keitt is entitled to this information pursuant to Brady v. Maryland, 373 U.S. 83 (1963). Finally, for the reasons cited in the previous sentence and the prior paragraph, please provide all reports and notes memorializing the Government's September 26, 2006 interview with Mr. DerMinassian.

Please contact me if you have any questions or would like to discuss these issues. I can be reached at (202) 393-7088. I look forward to your response.

Sincerely,

/s/

Steven J. McCool

Deft

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | criminal No.: **CR 05 - 127** |
| | * | |
| v. | * | **Filed:** |
| | * | |
| WILHELM DERMINASSIAN | * | **Violations:** 18 U.S.C. § 201(c)(1)(B) |
| | * | 18 U.S.C. §§ 1343,1346 |
| | * | |

********

## INFORMATION

The United States of America, acting through its attorneys, charges:

COLLYER, J. RMC

A

**I.**

APR 1 1 2005

### Count One (18 U.S.C. §§ 1343,3346)

#### General Allegations

1.     From approximately August 2000 through April 2003 Wilhelm DerMinassian ("Defendant") served as the Associate Director in charge of the Traffic Services Administration, a division of the District of Columbia's Department of Transportation (hereinafter collectively referred to as the "D.C. D.O.T.").

2.     At all times relevant to this Information Company A, not named as a defendant herein, provided traffic engineering services to the D.C. D.O.T. under its $12.9 million Operational Support contract.

3.     At all times relevant to this Information Person A-1, not named as a defendant herein, was a Project Manager for Company A and was in charge of the day-to-day operations of the Operational Support contract, and Person A-2, not named as a defendant herein, was a Vice-President for Company A with supervisory authority over Person A-1 and the Operational Support contract.

Case Related To   CR 05 - 126

**EXHIBIT**

2

4.      At all times relevant to this Information the Defendant, in his capacity as the Associate Director of the D.C. D.O.T., was responsible for the administration and oversight of the Operational Support contract.

The Scheme to Defraud

5.      From approximately October 2001 through April 2003, in the District of Columbia and elsewhere, the Defendant, together with Company A, through Persons A-1 and A-2, did unlawfully and knowingly devise and participate in a scheme and artifice to deprive the District of Columbia and its citizens of their intangible right to his honest services as a public official, and to have those services performed free from deceit, favoritism, bias, conflict of interest and self-enrichment.

Overview of the Scheme

6.      It was part of the scheme that from approximately October 2001 through October 2002 the Defendant solicited and accepted approximately $20,000 in cash and other items of value from Company A, through Persons A-1 and A-2, in connection with the Operational Support contract, including:

    A.      on or about October 2, 2001 the Defendant solicited and accepted $2,500 in cash;

    B.      on or about October 26, 2001 the Defendant solicited and accepted $4,400 in cash;

    C.      on or about April 34 2002 the Defendant solicited and accepted $300 in cash; and

    D.      on or about September 27, 2002 the Defendant solicited and accepted $10,544.99 in vehicle repair services.

7.      It was further part of the scheme that the Defendant concealed his receipt of the cash and other items of value detailed in Paragraph 6 by, among other things, insisting in several instances

-2-

on receiving payments in cash.

8.      It was further part of the scheme that the Defendant solicited and accepted the cash and other items of value detailed in Paragraph 6 with the intent to be influenced to favor Company A in his oversight and administration of the Operational Support contract, thus depriving the District of Columbia and its citizens of their intangible right to his honest services as a public official.

9.      It was further part of the scheme that from approximately October 2001 through April 2003 the Defendant had an undisclosed and improper conflict of interest in that he failed to report his receipt of the cash and other items of value detailed in Paragraph 6, thus depriving the District of Columbia and its citizens of their intangible right to his honest services as a public official.

10.     It was further part of the scheme that between approximately October 2001 and April 2003 the Defendant, having been influenced by the cash and other items of value detailed in Paragraph 6, took official actions in connection with the Operational Support contract that benefitted the financial interests of Company A, including the recommendation and approval of additional work through non-competitive change orders to the Operational Support contract, thus depriving the District of Columbia and its citizens of their intangible right to his honest services as a public official.

11.     It was further part of the scheme that between approximately October 2001 and April 2003 the Defendant, having been influenced by the receipt of the cash and other items of value detailed in Paragraph 6, and having failed to disclose the conflict of interest arising therefrom, recommended and approved three separate change orders to the Operational Support contract worth a total of $5,655,871.

12.     It was further part of the scheme that from approximately October 2001 through April

-3-

2003 **the Defendant** intentionally **deceived the** District **of Columbia and its citizens** into **believing that his official acts in** connection with the **Operational Support contract were free from the taint** of favoritism, **bias,** conflict of interest and **self-enrichment, when in fact** he did **have an undisclosed conflict of interest and had** been influenced by his receipt **of** the **cash and other items of** value detailed in Paragraph *6.*

<u>Use of the Interstate Wires in Furtherance of the Scheme</u>

13.     **For the purpose of executing** the **scheme and artifice to defraud detailed in Paragraph 5, an** or about October **22, 2001** the **Defendant caused** Person **A-1, who was in his office in** Washington, D.C., *to* telephone **Person A-3, who was in** Annapolis, Maryland, **which resulted in** Person **A-3 withdrawing cash** from a bank account, **$4,400** of **which Person A-1 later gave to the** Defendant on or about October 26, 2001, such **use of the interstate wires being foreseeable to** the **Defendant.**

## II.

### Count Two (18 U.S.C. § 201(c)(1)(B))

<u>General Allegations</u>

1.    Paragraph 1 of **Count One** of this Information is realleged and incorporated by reference as though filly set forth herein.

2.    At all times relevant to this Information Company B, not named as a defendant herein, provided traffic engineering services to the D.C.D.O.T. under its $17.5 million Integrated Traffic Management System ("I.T.M.S.") contract.

3.    At all times relevant to this Information Persons B-1 and B-2, neither of whom is named as a defendant herein, were principals, officers and owners of Company B with supervisory authority for its performance of the I.T.M.S. contract.

4.    At all times relevant to this Information the Defendant, in his capacity as the Associate Director of the D.C.D.O.T., was responsible for the administration and oversight of the I.T.M.S. contract.

<u>Description of the Offense</u>

5.    On or about October 18, 2002 the Defendant sought to have Company B, though Person B-2, provide him with an item of personal value, to wit, to pay a $1,348.91 hotel bill on the Defendant's behalf, thus enabling the Defendant to make personal use of, and benefit from, a monetary travel advance previously issued to him by *the* District of Columbia.

6.    *On* or about October 18,2002  Company B, through Person B-2 after consultation with Person B-1, paid the Defendant's hotel bill detailed in Paragraph 5.

7.    The Defendant's acceptance of the item of personal value detailed in Paragraphs 5 and 6

-5-

05/03/2005  08:33    2026284177                CQBURNANDSCHERTLER                        PAGE   07/25

was not provided for by law for the proper discharge of the Defendant's official duty.

8.      The Defendant, a public official, sought and accepted the item of personal value detailed

in Paragraphs 5 and 6 for an official act to be performed by the Defendant, to wit, favorable

treatment of Company B by the Defendant in his future administration and oversight of the

I.T.M.S. contract.

## III.

### Jurisdiction and Venue

The offenses charged in this Information were carried out in the District of Columbia within the five years preceding the filing of this Information.

IN VIOLATION OF TITLE 18 UNITED STATES CODE, SECTIONS 201, 1343 AND 1346.

DATED: _Apil 11, 2005_

_R. Hewitt Pate / EMA_

**R. HEWITT PATE**
**Assistant** Attorney General

_SDH_

SCOTT D. HAMMOND
Deputy Assistant Attorney General

_MS_

MARC SIEGEL
**Director** of Criminal Enforcement

_Lisa M. Phelan_

LISA M. PHELAN
**Chief, National Criminal**
**Enforcement Section**

**Antitrust** Division
**United States Department of Justice**

_Peter H. Goldberg_

PETER H. GOLDBERG
**Attorney, Antitrust Division**
United States Department of Justice
1401 H Street, NW, Suite 3700
**Washington, D.C. 20530**
**Tel: (202) 307-5784**

_John Schmoll_

JOHN SCHMOLL
Attorney, Antitrust Division
**United States Department of Justin**
**1401 H Street, NW, Suite 3700**
Washington, D.C. 20530
Tel: (202) 307-5780

-7-

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | criminal No.: **CR 05 - 127** |
| | * | |
| v. | * | **Filed:** |
| | * | |
| WILHELM DERMINASSIAN | * | Violations: 18 U.S.C. § 201(c)(1)(B) |
| | * | 18 U.S.C. §§ 1343,1346 |
| | * | |

********

## INFORMATION

The United States of America, acting through its attorneys, charges:

**COLLYER, J. RMC**

**A**

**I.**

APR 1 1 2005

### Count One (18 U.S.C. §§ 1343,3346)

#### General Allegations

1.     From approximately August 2000 through April 2003 Wilhelm DerMinassian ("Defendant") served as the Associate Director in charge of the Traffic Services Administration, a division of the District of Columbia's Department of Transportation (hereinafter collectively referred to as the "D.C. D.O.T.").

2.     At all times relevant to this Information Company A, not named as a defendant herein, provided traffic engineering services to the D.C. D.O.T. under its $12.9 million Operational Support contract.

3.     At all times relevant to this Information Person A-1, not named as a defendant herein, was a Project Manager for Company A and was in charge of the day-to-day operations of the Operational Support contract, and Person A-2, not named as a defendant herein, was a Vice-President for Company A with supervisory authority over Person A-1 and the Operational Support contract.

Case Related To   CR 05 - 126

EXHIBIT

2

4.     At all times relevant to this Information the Defendant, in his capacity as the Associate

Director of the D.C. D.O.T., was responsible for the administration and oversight of the

Operational Support contract.

The Scheme to Defraud

5.     From approximately October 2001 through April 2003, in the District of Columbia and

elsewhere, the Defendant, together with Company A, through Persons A-1 and A-2, did

unlawfully and knowingly devise and participate in a scheme and artifice to deprive the District of

Columbia and its citizens of their intangible right to his honest services as a public official, and to

have those services performed free from deceit, favoritism, bias, conflict of interest and self-

enrichment.

Overview of the Scheme

6.     It was part of the scheme that from approximately October 2001 through October 2002 the

Defendant solicited and accepted approximately $20,000 in cash and other items of value from

Company A, through Persons A-1 and A-2, in connection with the Operational Support contract,

including:

  A.     on or about October 2, 2001  the Defendant solicited and accepted $2,500 in cash;

  B.     on or about October 26, 2001 the Defendant solicited and accepted $4,400 in cash;

  C.     on or about April 34 2002 the Defendant solicited and accepted $300 in cash; and

  D.     on or about September 27, 2002  the Defendant solicited and accepted $10,544.99

  in vehicle repair services.

7.     It was further part of the scheme that the Defendant concealed his receipt of the cash and

other items of value detailed in Paragraph 6 by, among other things, insisting in several instances

-2-

on receiving payments in cash.

8.      It was further part of the scheme that the Defendant solicited and accepted the cash and other items of value detailed in Paragraph 6 with the intent to be influenced to favor Company A in his oversight and administration of the Operational Support contract, thus depriving the District of Columbia and its citizens of their intangible right to his honest services as a public official.

9.      It was further part of the scheme that from approximately October 2001 through April 2003 the Defendant had an undisclosed and improper conflict of interest in that he failed to report his receipt of the cash and other items of value detailed in Paragraph 6, thus depriving the District of Columbia and its citizens of their intangible right to his honest services as a public official.

10.     It was further part of the scheme that between approximately October 2001 and April 2003 the Defendant, having been influenced by the cash and other items of value detailed in Paragraph 6, took official actions in connection with the Operational Support contract that benefitted the financial interests of Company A, including the recommendation and approval of additional work through non-competitive change orders to the Operational Support contract, thus depriving the District of Columbia and its citizens of their intangible right to his honest services as a public official.

11.     It was further part of the scheme that between approximately October 2001 and April 2003 the Defendant, having been influenced by the receipt of the cash and other items of value detailed in Paragraph 6, and having failed to disclose the conflict of interest arising therefrom, recommended and approved three separate change orders to the Operational Support contract worth a total of $5,655,871.

12.     It was further part of the scheme that from approximately October 2001 through April

-3-

2003 **the Defendant** intentionally **deceived the** District **of Columbia and its citizens** into **believing that his official acts in** connection with the **Operational Support contract were free from the taint** of favoritism, **bias,** conflict of interest **and self-enrichment, when in fact** he **did have an undisclosed conflict of interest and had** been influenced by his receipt **of** the **cash and other items of** value detailed in Paragraph *6.*

<u>Use of the Interstate Wires in Furtherance of the Scheme</u>

13.    **For the purpose of executing** the **scheme and artifice to defraud detailed in Paragraph** *5,* **an** or about October **22, 2001** the **Defendant** caused Person **A-1, who was in his office in** Washington, D.C., *to* telephone **Person A-3, who was in Annapolis,** Maryland, **which resulted in** Person **A-3 withdrawing cash** from a bank account, **$4,400** of **which Person A-1 later gave to the** Defendant on or about October 26, 2001, **such use of the interstate wires being foreseeable to** the **Defendant.**

## II.

### Count Two (18 U.S.C. § 201(c)(1)(B))

<u>General Allegations</u>

1.    Paragraph 1 of Count One of this Information is realleged and incorporated by reference as though fully set forth herein.

2.    At all times relevant to this Information Company B, not named as a defendant herein, provided traffic engineering services to the D.C.D.O.T. under its $17.5 million Integrated Traffic Management System ("I.T.M.S.") contract.

3.    At all times relevant to this Information Persons B-1 and B-2, neither of whom is named as a defendant herein, were principals, officers and owners of Company B with supervisory authority for its performance of the I.T.M.S. contract.

4.    At all times relevant to this Information the Defendant, in his capacity as the Associate Director of the D.C.D.O.T., was responsible for the administration and oversight of the I.T.M.S. contract.

<u>Description of the Offense</u>

5.    On or about October 18, 2002 the Defendant sought to have Company B, though Person B-2, provide him with an item of personal value, to wit, to pay a $1,348.91 hotel bill on the Defendant's behalf, thus enabling the Defendant to make personal use of, and benefit from, a monetary travel advance previously issued to him by *the* District of Columbia.

6.    *On* or about October 18,2002  Company B, through Person B-2 after consultation with Person B-1, paid the Defendant's hotel bill detailed in Paragraph 5.

7.    The Defendant's acceptance of the item of personal value detailed in Paragraphs 5 and 6

-5-

05/03/2005  08:33   2026284177          CQBLIRNANDSCHERTLER                    PAGE   07/25

was not provided for by law for the proper discharge of the Defendant's official duty.

8.      The Defendant, a public official, sought and accepted the item of personal value detailed

in Paragraphs 5 and 6 for an official act to be performed by the Defendant, to wit, favorable

treatment of Company B by the Defendant in his future administration and oversight of the

I.T.M.S. contract.

## III.

### Jurisdiction and Venue

The offenses charged in this Information were carried out in the District of Columbia within the five years preceding the filing of this Information.

IN VIOLATION OF TITLE 18 UNITED STATES CODE, SECTIONS 201, 1343 AND 1346.

DATED: _April 11, 2005_

_R. Hewitt Pate / BMA_

**R. HEWITT PATE**
**Assistant** Attorney General

SCOTT D. HAMMOND
Deputy Assistant Attorney General

MARC SIEGEL
**Director of** Criminal Enforcement

LISA M. PHELAN
**Chief, National Criminal**
**Enforcement Section**

**Antitrust** Division
**United States Department of Justice**

PETER H. GOLDBERG
**Attorney, Antitrust Division**
United **States Department of Justice**
**1401 H Street, NW, Suite 3700**
**Washington, D.C. 20530**
**Tel: (202) 307-5784**

JOHN SCHMOLL
Attorney, Antitrust Division
**United States Department of Justin**
**1401 H Street, NW, Suite 3700**
Washington, **D.C. 20530**
Tel: (202) 307-5780



**U.S. Department of Justice**

Antitrust Division

*City Center Building*
*1401 H Street, NW, Suite 3700*
*Washington, DC 20530*

October 12, 2007

<u>VIA E-MAIL</u>

Steven J. McCool
Mallon & McCool, LLC
1776 K Street, N.W., Suite 200
Washington, D.C. 20006
smccool@mallonandmccool.com

    Re:    <u>United States v. *Kenneth Keitt*, Criminal No. 07-041 (RJL) (D.D.C.)</u>

Dear Mr. McCool:

    I am writing in response to your letter of October 6, 2007, in which you asked the United States to respond in writing to three requests for information: (i) a request for any rough notes taken during interviews conducted by the United States, as well as an inventory of any such notes; (ii) a request for the United States' position on certain charges brought in the case of United States v. *Wilhelm DerMinassian*, Criminal No. 05-127 (RMC) (D.D.C); and (iii) a request for any notes or reports of a September 26, 2006 interview of Wilhelm DerMinassian. On March 27, 2007, the United States produced and/or made available to your client all of the discovery to which he is entitled pursuant to Federal Rules of Criminal Procedure 16 and 26.2, 18 U.S.C. § 3500, and *Brady* v. *Maryland*, 373 U.S. 83 (1963), United States *v. Giglio*, 405 U.S. 150 (1972), and their progeny. Accordingly, the United States respectfully denies each of your requests.

                    Sincerely,

                    /s/ John Terzaken

                    John Terzaken
                    National Criminal Enforcement Section



**EXHIBIT**

3

D. C. FORMAL AGREEMENT NO. **014-98**

THIS AGREEMENT, consisting of sixteen (16) pages; Attachment A, Employee Classifications and Hourly Billing Rates; Attachment B, General Provisions; Attachment C, Key Personnel; Attachment D, Reimbursable Costs; and Attachment E, Certifications; made and entered into this _____ SEP 1 5 2000 _____ day of _____ and between the DISTRICT OF COLUMBIA, a municipal corporation, hereinafter called "District", and FREDERIC R. HARRIS, INC., hereinafter called "Consultant", whose address is 1707 H Street, N.W., Suite *200,* Washington, D.C. 20006.

WITNESSETH:

WHEREAS, the District of Columbia Department of Public Works, hereinafter called "DPW", desires to proceed with traffic system operational support for the District of Columbia Transportation Management System; and

WHEREAS, DPW has determined that it must engage the services of a Consultant to assist its Bureau of Traffic *Services* in providing the required operational support in the form of personnel, vehicles, and field and office equipment; and

WHEREAS, the Federal Highway Administration of the United States Department of Transportation, hereinafter called "FHWA", has agreed to participate in the cost of such engineering services when performed in conjunction with federal-aid projects, or considered *to* be eligible for federal-aid Construction funds.

NOW, THEREFORE, the parties hereto, for the consideration hereinafter set forth, mutually agree as follows:

**EXHIBIT**

4

| Description | Quantity |
|---|---|
| - Enclosure, mount, pole | 6 |
| - Field electronics | 6 |
| - Line receiver | 6 |
| - 'Switches | 1 |
| - Monitor | 4 |
| - T/L video recorder | 1 |
| - Equipment cabinet | i |
| ■ Development Panels | 2 |
|     - 170E controller | 2 |
|     - Fully loaded equipment cabinet | 2 |
| • Display Panels | 2 |
|     - LED outputs | |
|     - Full input File Switch Complement | |
| ■ Load Panels | 2 |
|     - 100 watt lamps | |
|     - 18x3 channels | |
| ■ Cable and Panels | 1 |
|     - 100 pair cable T/P | |
|     - 50 pair cable T/P | |
|     - 25 pair cable T/P | |
|     - 12 pair cable T/P | |
|     - 12 pair fiber | |
|     - 48 pair fiber | |
|     - CAT 5 T/P-4 pair | |
|     - RG 6 coax | |

Sec. 5. Transportation    The Consultant ~ball supply eight (8) vehicles to support communications and field equipment maintenance and traffic engineering investigations. The fleet of vehicles shall include five (5) fully quipped general purpose service vehicles, two (2) bucket trucks, and one (1) lift truck. The lift truck and bucket trucks shall be delivered with a full complement of equipment to support the program. The Consultant shall purchase or lease the vehicles at the commencement of the contract. One or more of the vehicles shall be made available for use by District personnel at the request of TSSD. The Consultant shall maintain each vehicle in good repair and fully operational condition for the full extent of the agreement. Vehicles shall be replaced as necessary in order to maintain reliable operation. The Consultant shall be responsible for fuel, maintenance and insurance costs for the duration of the agreement. All vehicles shall be insured by the Consultant to cover usage by TSSD employees.