**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | **Criminal No. 07-041 (RJL)** |
| **v.** | ) | |
| | ) | |
| **KENNETH KEITT,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**TRIAL MEMORANDUM OF THE UNITED STATES**

JOHN F. TERZAKEN
MARK W. PLETCHER
EMILY W. ALLEN
Attorneys, Antitrust Division
U.S. Department of Justice
450 5th Street, N.W., 11th Floor
Washington, DC 20530
Telephone: (202) 307-6694

## TABLE OF CONTENTS

I.     INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.    The Defendant and DMJM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.    DerMinassian and the DC DOT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    C.    Travers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    D.    The Gratuity Scheme . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        i.    Defendant Directs his Subordinate to Deliver $6,900 Cash . . . . . . 6

        ii.   Defendant Excuses DerMinassian from Paying Back the $6,900 . . 8

III.   GRATUITIES AND RELATED LEGAL ISSUES . . . . . . . . . . . . . . . . . . . . . 9

    A.    Statutory Language . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    B.    Proof of "Public Official" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    C.    Proof of "Something of Value" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    D.    Proof of "Official Act" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    E.    Proof of "For or Because Of" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

IV.    EVIDENTIARY ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    A.    Background Evidence is Admissible . . . . . . . . . . . . . . . . . . . . . . . . . . 19

i

B.    Witness Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    i.    A Witness May Testify to Knowledge and Intent of Others . . . . . 20

    ii.    Admissions and Statements Against Interest . . . . . . . . . . . . . . . . 22

    iii.    Prior Inconsistent Statements as Substantive or Impeachment

            Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    v.    Prior Consistent Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

    vi.    Admissibility of Plea Agreement . . . . . . . . . . . . . . . . . . . . . . . . . 25

    vii.    Attacks on Credibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

    viii.    Character Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

C.    Admissibility of Documents and Business Records . . . . . . . . . . . . . . . . 29

# TABLE OF AUTHORITIES

STATUTES

18 U.S.C. § 1343 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

18 U.S.C. § 1346 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

18 U.S.C. § 201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 5, 9-11

Federal Rule of Evidence 402 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Federal Rule of Evidence 403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

Federal Rule of Evidence 404 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Federal Rule of Evidence 405 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Federal Rule of Evidence 602 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 25, 26

Federal Rule of Evidence 701 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21, 26, 29

Federal Rule of Evidence 801 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22-24

Federal Rule of Evidence 803 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Federal Rule of Evidence 901 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

Federal Rule of Evidence 902 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

CASES

*United States v. Schaffer*, 183 F.3d 833 (D.C. Cir. 1999) . . . . . . . . . . . . . 10, 15-17, 29

*Flintkote Co. v. Lysfjord*, 246 F.2d 368 (9th Cir. 1957) . . . . . . . . . . . . . . . . . . . . . . . 25

*Gaines v. Walker*, 986 F.2d 1438 (D.C. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*In re Sealed Case*, 352 F.3d 409 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

iii

*Michelson v. United States*, 335 U.S. 469 (1948) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Ahn*, 231 F.3d 26 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 17

*United States v. Brewster*, 506 F.2d 62 (D.C. Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Brown*, 508 F.3d 1066 (D.C. Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Bucheit*, 134 Fed. Appx. 842 (6th Cir. 2005) . . . . . . . . . . . . . . . . . . . 11

*United States v. Caldwell*, 776 F.2d 989 (11th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . 30

*United States v. Campbell*, 684 F.2d 141 (D.C. Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Casoni*, 950 F.2d 893 (3d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Crozier*, 987 F.2d 893 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Daly*, 842 F.2d 1380 (2d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Daly*, 842 F.2d 1380 (2d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Distler*, 671 F.2d 954 (6th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Evans*, 484 F.2d 1178 (2d Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . 25, 26

*United States v. Franco*, 874 F.2d 1136 (7th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . 30

*United States v. Gerry*, 515 F.2d 130  (2d Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Gorman*, 807 F.2d 1299 (6th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Hamilton*, 689 F.2d 1262 (6th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Harris*, 491 F.3d 440 (D.C. Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. James*, 555 F.2d 992 (D.C. Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Jordan*, 810 F.2d 262 (D.C. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Juvenile Male*, 864 F.2d 641 (9th Cir.1988) . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Kemp*, 500 F.3d 257 (3d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Klein*, 488 F.2d 481 (2d Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Mariano*, 983 F.2d 1150 (1st Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Milton*, 8 F.3d 39 (D.C. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Morgan*, 555 F.2d 238 (9th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Morrow*, 2005 WL 3159572 (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . 19, 20

*United States v. Nazzaro*, 889 F.2d 1158 (1st Cir.1989) . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Parker*, 749 F.2d 628 (11th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . 30

*United States v. Pierre*, 781 F.2d 329 (2d Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Salameh*, 152 F.3d 88 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Smith*, 267 F.3d 1154 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Stock*, 948 F.2d 1299 (D.C. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Stover*, 329 F.3d 859 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Sun-Diamond Growers*, 138 F.3d 961 (1998) . . . . . . . . . . . . . . . . . . . 12

*United States v. Sun-Diamond Growers*, 526 U.S. 398 (1999) . . . . . . . . . . . . . . . . 12, 15

*United States v. Tarantino*, 846 F.2d 1384 (D.C. Cir.1988) . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Valdes*, 475 F.3d 1319 (D.C. Cir. 2007) (en banc) . . . . . . . . . . . . 12, 15

*United States v. Valdez-Torres*, 108 F.3d 385 (D.C. Cir. 1997) . . . . . . . . . . . . . . . . . . 21

*United States v. Washington*, 106 F.3d 983 (D.C. Cir. 1997) . . . . . . . . . . . . . . . . . . . . 28

*United States v. Wiggins*, 946 F.2d 1567 (D.C. Cir. 1991) . . . . . . . . . . . . . . . . . . . 28, 29

*United States v. Williams*, 705 F.2d 603 (2d Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Zito*, 467 F.2d 1401 (2d Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Virgin Islands v. Knight*, 989 F.2d 619 (3d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . 21, 26

*Williams Enterprises, Inc. v. Sherman R. Smoot Co.*, 938 F.2d 230 (D.C. Cir. 1991) . . 21


EVIDENCE

Change Order No. 2, D.C. Formal Agreement 014-98 (June 18, 2003) . . . . . . . . . . . . . . 3

Change Order No. 3, D.C. Formal Agreement 014-98 (July 25, 2003) . . . . . . . . . . . . . . 3

Change Order No. 4, D.C. Formal Agreement 014-98 (Dec. 4, 2003) . . . . . . . . . . . . . . 3

D.C. Formal Agreement No. 014-98 (Sept. 15, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

Email from Kenneth Keitt, September 19, 2001 (Ex. 24) . . . . . . . . . . . . . . . . . . . . . . . 14

Email from Kenneth Keitt, September 24, 2001 (Ex. 7) . . . . . . . . . . . . . . . . . . . . . . . . 14

Letter from D.C. Department of Public Works, September 28, 2001 . . . . . . . . . . . . . . 13

Supplement to D.C. Formal Agreement No. 014-98 (Mar. 4, 2003) . . . . . . . . . . . . . 3, 14

## I.     INTRODUCTION

On December 13, 2006, a federal grand jury returned a one-count Indictment charging Kenneth Keitt ("Keitt" or "Defendant") with giving, offering, and promising a gratuity to a public official, in violation of 18 U.S.C. § 201(c)(1).  The Indictment charges that during the period October 2001 until in or about December 2001, Defendant gave $6,900 to Wilhelm DerMinassian (referred to in the Indictment as "Person A"), a District of Columbia Department of Transportation ("DC DOT") official, for or because of official acts performed or to be performed by DerMinassian relating to a DC DOT operational support contract.

A list of the witnesses the United States presently intends to call in its case-in-chief is attached as Attachment A.  A list of the exhibits the United States presently anticipates introducing in its case-in-chief is attached as Attachment B.

The purpose of this memorandum is to address legal and evidentiary issues, not previously briefed by the parties, that may arise at trial.

## II.     STATEMENT OF THE CASE

The United States expects that the evidence at trial will show the facts as set forth below.  The United States does not believe Defendant disputes the facts relating to the basic structure of the companies and relevant personnel, or the fact that Defendant's subordinate employee gave DerMinassian $6,900 at Defendant's instruction.  The United States believes Defendant does dispute the fact that Defendant made clear that

DerMinassian had no obligation to pay back that money.

A.    **The Defendant and DMJM**

DMJM + Harris, Inc. ("DMJM") is a general engineering firm and one of the eleven companies operating under the umbrella of the holding company Aecom Technology Corp.  DMJM is headquartered in New York, New York and has offices across the United States, including, relevant here, one in Fairfax, Virginia.  On September 15, 2000, DMJM was awarded a $12.9 million, federally-funded contract with the DC DOT known as the operational support contract.[1]  D.C. Formal Agreement No. 014-98 (Sept. 15, 2000) ("Operational Support Contract").  From September 2000 through February 2004, Defendant, then a vice president of DMJM, was in charge of DMJM's Fairfax, Virginia office.  Defendant had final management authority over DMJM's work on the operational support contract, and management of the contract was a major portion of Defendant's work at DMJM.  The operational support contract was one of the largest contracts administered through DMJM's Fairfax office.

Under the specific terms of the operational support contract, DMJM was awarded one guaranteed year of work, worth up to $3.4 million, and the possibility of continuing to work on the project for an additional four years, which could bring the total value of

---

[1] The primary purpose of the operational support contract was to allow the DC DOT to supplement its in-house staff with additional manpower and expertise relating to the District of Columbia's traffic management system.  Operational Support Contract at Art. I.  Essentially, DMJM provided employees who worked with the DC DOT's existing staff on traffic management needs.

the contract up to $12.9 million. *Id.* at Art. IX., Sec. 2. For DMJM to receive the benefits of the four additional years of work, the DC DOT had to exercise each of the four option years provided for by the operational support contract.[2] *Id.* The DC DOT, through DerMinassian, was considering whether to exercise the first of these four option years in the fall of 2001.

Also in the fall of 2001, DMJM and the DC DOT began discussions regarding emergency support services for the District of Columbia. Specifically, shortly after the September 11 attacks, the DC DOT was informed that it would likely be receiving a large congressional grant to upgrade the District of Columbia's ability to facilitate an evacuation of the city in the event of a terrorist attack or other catastrophic event. In anticipation of this grant, the DC DOT began discussions about the possibility of installing closed circuit television cameras around the District to enable the DC DOT to monitor traffic conditions to aid in an evacuation. Defendant, for DMJM, and DerMinassian, for the DC DOT, were the among the principal persons responsible for discussing and negotiating this piece of business.

_____

[2] The DC DOT ultimately exercised all four option years of the contract. In addition to realizing the full value of the original contract, DMJM was awarded $6,380,871 in the form of four sole-source, non-competitive change orders to the operational support contract, *see* Supplement to D.C. Formal Agreement 014-98 (Mar. 4, 2003); Change Order No. 2, D.C. Formal Agreement 014-98 (June 18, 2003); Change Order No. 3, D.C. Formal Agreement 014-98 (July 25, 2003); *and* Change Order No. 4, D.C. Formal Agreement 014-98 (Dec. 4, 2003) ("CCTV Supplemental Contracts"), bringing the ultimate value of the contract to $19,274,578.94.

### B.     DerMinassian and the DC DOT

The DC DOT is a cabinet-level agency within the District of Columbia.  In about November 1990, DerMinassian began work at the DC DOT as a supervisory general engineer and later became acting chief of the traffic signal operations branch.  In about August 2000, he was promoted to Associate Director of the DC DOT's Traffic Services Administration ("TSA"), where he worked until April 2003.[3]  DerMinassian is generally regarded as the person responsible for initially proposing the projects that would become the operational support contract.  From its inception in September 2000 through April 2003, DerMinassian had supervisory authority over the operational support contract.  During this time, DerMinassian also participated in, and had influence over, decisions made by the DC DOT to exercise the option year extensions under the operational support contract, as well as decisions regarding change orders to the contract.

DerMinassian agreed to plead guilty to a two-count criminal Information, filed in the United States District Court for the District of Columbia on April 11, 2005, charging him with: (1) one count of honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346, in connection with a scheme between him and DMJM to deprive the District of Columbia and its citizens to their intangible right to DerMinassian's honest services; and (2) one count of receiving a gratuity from another DC DOT contracting company, Dunn

---

[3] As Associate Director of TSA, DerMinassian had approximately one hundred D.C. employees and numerous contractors under his supervision.  DerMinassian himself reported directly to Dan Tangerlini, the Director of the DC DOT.

Engineering Associates, P.C. ("Dunn Engineering"), in violation of 18 U.S.C. §201(c)(1)(B).[4] Under the terms of the plea agreement, DerMinassian agreed to serve thirty months incarceration, pay a $50,000 criminal fine, and make restitution to the District of Columbia in the amount of $50,000.

### C.    Travers

Michael Travers was Defendant's direct subordinate at DMJM. During the relevant period, Travers was the project manager responsible for day-to-day oversight of DMJM's work on the operational support contract. During the relevant period, Travers worked at the DC DOT office with DerMinassian. Travers recalls that from the moment he was first assigned to the operational support contract, Defendant counseled him to do whatever it took to make DerMinassian happy because the operational support contract was a major one for DMJM.

### D.    The Gratuity Scheme

During the period from about October 2001 until about December 2001, Defendant, on behalf of DMJM, gave a $6900 gratuity to DerMinassian for or because of official acts performed or to be performed by DerMinassian relating to the operational support contract, including his favorable treatment in administering and overseeing the

---

[4] Dunn Engineering agreed to plead guilty to a one-count criminal Information, which was filed in the United States District Court for the District of Columbia on April 11, 2005, charging it with one count of providing a gratuity to DerMinassian in violation of 18 U.S.C. § 201(c)(1)(A). Under the terms of the plea agreement, Dunn Engineering was required to pay a $75,000 criminal fine.

operational support contract, his positive input regarding the annual renewal of that

contract, his favorable exercise of discretion not to terminate that contract, and his

favorable outlook on and consideration of DMJM's proposals and suggestions for

additional DC DOT business, including the provision of emergency traffic services after

September 11, 2001.

### i.    Defendant Directs his Subordinate to Deliver $6,900 Cash

As part of their due diligence in planning the development and operation of a

traffic management center in DC, the DC DOT, DMJM, and Dunn Engineering planned

two trips to inspect other states' traffic management facilities.  The first trip was

scheduled for September 30 through October 5, 2001, and involved visiting traffic

management centers located in Atlanta, Georgia; Phoenix, Arizona; Houston, Texas; and

Las Vegas, Nevada ("the four city trip").  The second trip was scheduled for October 23

through October 28, 2001, and involved visiting multiple traffic management centers in

southern California ("California trip").  Travers and three subordinates participated in the

trips from DMJM; DerMinassian and several other DC DOT employees represented the

DC DOT.  Neither of these trips was pursuant to or covered by any term or regulation of

any contract the DC DOT had with DMJM or Dunn Engineering.  Rather, each company

or agency participating in the trips was expected to and did pay the expenses of their

respective travelers.

Around October 2, 2001, during the four city trip, DerMinassian phoned

6

Defendant and told him that he was having financial problems and needed money to pay his mortgage.  He asked Defendant to help him out by giving him $2,500.  Defendant told DerMinassian that he would take care of it.  Soon after this conversation, Defendant called his subordinate, Travers, in Houston and directed him to loan $2,500 in cash to DerMinassian.  Travers did not question Defendant about DerMinassian's need for the money.  Travers believed that he was loaning DerMinassian the money.

Immediately following his call with Defendant, Travers went to three different banks in Houston and withdrew the $2,500 by taking cash advances on his personal credit card.  Travers returned to the traffic management center in Houston with the $2,500 cash in hand, and delivered the money in an envelope to DerMinassian with no questions asked.  DerMinassian was expecting the money based on his conversation with Defendant.

Before departing for the California trip, on or about October 22, 2001, DerMinassian again asked Defendant for help with his financial problems.  Defendant replied that he would take care of it.  Defendant, in turn, went to Travers' DMJM office and asked him to again advance what he described to Travers as a loan to DerMinassian, this time for $5,000.  Travers became upset since he did not want to withdraw his personal funds, but he nonetheless acquiesced to Defendant's demand and did what he was he was told.

Following his conversation with Defendant, Travers scrambled to withdraw the

7

$5,000 cash before the banks closed. Travers was in the District at the time and knew that his bank in Annapolis, Maryland would be closed before he returned home. Travers called his wife Stephanie Travers, who was at home in Annapolis, and asked her to withdraw the money. Specifically, he asked her to withdraw $6,000 from the family's savings account: $5,000 for DerMinassian and $1,000 for Travers' personal expenses on the trip. After making arrangements with the Annapolis bank, Mrs. Travers withdrew the money late in the afternoon of October 22.

Travers took the $5,000 he withdrew for DerMinassian with him on the California trip. During the second day of the trip, on or about October 24, 2001, Travers delivered $4,400 in cash to DerMinassian in DerMinassian's hotel room. Still upset with the prospect of fronting another significant sum of money to DerMinassian, Travers only gave DerMinassian $4,400 of the $5,000 he had been instructed by Defendant to give to DerMinassian. Travers called Defendant later in the afternoon of October 24 to advise him that the money had been delivered to DerMinassian.

### ii. Defendant Excuses DerMinassian from Paying Back the $6,900

After the four city and California trips, Travers asked DerMinassian numerous times to reimburse him for the $6,900, but to no avail. DerMinassian, for his part, believed that Travers had paid him from a DMJM expense account, and that Defendant had given him the money free and clear of any obligation to repay it. When DerMinassian learned that Travers had in fact paid the $6,900 from his personal account,

8

he agreed to talk to Defendant about the situation. DerMinassian called Defendant to make sure Defendant was going to see that Travers was repaid the $6,900. Defendant told DerMinassian that he would take care of it and pay Travers back through a bonus or other reimbursement.

Travers then spoke with Defendant about being repaid. Defendant told Travers he was not to discuss the issue again with DerMinassian. Instead, he told Travers to submit some receipts amounting to $6,900 with a DMJM expense report and Defendant would make sure the reimbursement was paid by the company. Travers understood that Defendant wanted him to create false receipts amounting to $6,900 and submit them to DMJM for reimbursement. Travers refused to submit fraudulent receipts. He believes Defendant let DerMinassian keep the $6,900 to ensure DerMinassian remained favorably inclined to maintain and expand DMJM's contract benefits, for the sake of the operational support contract and its future potential.

## III.    GRATUITIES AND RELATED LEGAL ISSUES

### A.    Statutory Language

Defendant is charged with one count of violating 18 U.S.C. § 201(c)(1), which states in pertinent part:

> Whoever otherwise than as provided by law for the proper discharge of official duty directly or indirectly gives, offers, or promises anything of value to any public official, . . . for or because of any official act performed or to be performed by such public official . . . shall be fined under this title or imprisoned

9

for not more than two years, or both.

18 U.S.C. § 201(c)(1)(A).  An "official act" is defined as "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending . . . in such official's official capacity."  18 U.S.C. § 201(a)(3).

A violation of this statute, therefore, requires the United States prove that a defendant (1) gave a thing of value (2) to a public official (3) for or because of any official act performed or to be performed by such public official.  *United States v. Schaffer*, 183 F.3d 833, 840 (D.C. Cir. 1999) (conviction reversed by presidential pardon).

**B.    Proof of "Public Official"**

The term "public official" means, among other things, "an officer or employee or person acting for or on behalf of the . . . District of Columbia, in any official function." 18 U.S.C. § 201(a)(1).  The District of Columbia Circuit has looked to "the plain language of the statute" to find that a General Schedule employee, at GS-12 with limited decision-making authority, is nonetheless clearly an "officer or employee" of the District of Columbia.  *United States v. Smith*, 267 F.3d 1154, 1159 (D.C. Cir. 2001) (finding that the defendant was an "officer or employee" under 18 U.S.C. § 208).  In this case, as a matter of law, DerMinassian, a DC DOT Associate Director, is a public official as defined in the statute.

10

C.     Proof of "Something of Value"

When Defendant absolved DerMinassian of any obligation to pay Travers back the

$6,900, he gave DerMinassian a thing of value.  *See United States v. Bucheit*, 134 Fed.

Appx. 842, 851 (6th Cir. 2005) (unpublished) (finding the act of withholding collection of

a debt is a "thing of value" and can be an illegal gratuity).  Indeed, courts have even held

that the loan itself, without any absolution, is a "thing of value" that can sustain a

conviction for bribery.  *United States v. Kemp*, 500 F.3d 257, 285 (3d Cir. 2007)

(concluding that "loans, so long as they are granted in exchange for an official act, may

drive a bribery prosecution"); *see also United States v. Crozier*, 987 F.2d 893, 901 (2d

Cir. 1993) ("as we have held in connection with § 201, any payment that the defendant

subjectively believes has value, including a loan, constitutes a thing 'of value' within the

meaning of § 666(c)"); *United States v. Gorman*, 807 F.2d 1299, 1305 (6th Cir. 1986)

(holding that a loan is a thing of value even when repaid in full with interest); *United

States v. Williams*, 705 F.2d 603, 620 (2d Cir. 1983).

D.     Proof of "Official Act"

The gratuity statute defines "official act" as "any decision or action on any

question, matter, cause, suit, proceeding or controversy, which may at any time be

pending, or which may by law be brought before any public official . . . ."  18 U.S.C.

§ 201(a)(3).  The D.C. Circuit explored this definition in *United States v. Valdes*,

implicitly recognizing that the determination of what constitutes an "official act" is a

11

legal question.  475 F.3d 1319 (D.C. Cir. 2007) (en banc).  The statute, the Court held, defines official acts as "a class of questions or matters whose answer or disposition is determined by the government[,]" such as, "'Should this person receive a contract . . . , and for how much?'" *Id.* at 1324, 1325 (noting, by contrast, that "§ 201 is not about officials' moonlighting, or their misuse of government resources, or the two in combination").  Thus, in *Valdes*, the defendant's use of a government database to search for publicly-available factual information was not an "official act" because it required no disposition or decision by the government.  *Id.* at 1325.  The matter giving rise to the official act, the Court found, need not be definite or certain.  *Id.* at 1328-29.  Earmarked funding for an identified governmental program, for example, is a pending matter that may require official action.  While an issue "that is linked only by pure supposition to an imaginary future matter" does not suffice as a "pending" matter, the Court suggested that a dispute with "real potential" for action or intervention by a government agency could satisfy the statutory requirements.  *Id.*

Moreover, an "official act" encompasses a series of actions or decisions by a public official.  In *United States v. Sun-Diamond Growers*, the Supreme Court quoted the D.C. Circuit's opinion below: "That an official has an abundance of relevant matters on his plate should not insulate him or his benefactors from the gratuity statute—as long as the jury is required to find the requisite intent to reward past favorable acts or to make future ones more likely."  526 U.S. 398, 403-04 (1999) (quoting *United States v. Sun-*

*Diamond Growers*, 138 F.3d 961, 969 (1998)).  Similarly, in *United States v. Ahn*, a police officer's conviction for receiving gratuities was upheld where the payments the officer received were given to induce his past and continuing failure to report the massage parlors' illegal activity, thereby rewarding him for a course of conduct rather than any unitary official act (or failure to act).  231 F.3d 26, 33 (D.C. Cir. 2000).

In the present case, DerMinassian's "official acts" were related to the "matter" of the operational support contract, then pending before him.  As the Associate Director with supervisory control over the operational support contract, DerMinassian had made, and was in a position to make, numerous governmental decisions that could either benefit or harm Defendant and DMJM's interests related to the operational support contract.  For example, during the fall of 2001, DerMinassian played a key role in discussions between DMJM and the DC DOT regarding the DC DOT's decision to exercise option years on the operational support contract—which the DC DOT did in fact exercise on September 28, 2001.  *See* Letter from D.C. Department of Public Works, September 28, 2001. DerMinassian also had supervisory authority over the DC DOT's task orders under the operational support contract, which could increase the value of the contract to DMJM.

DerMinassian also played a critical role in determining the District of Columbia's planning and expenditures for emergency services.  In particular, in the immediate aftermath of September 11, 2001, the DC DOT became aware it would be the recipient of a congressional grant to bolster emergency traffic services, largely through the installation

13

of closed circuit televisions ("CCTVs") to aid traffic flow. DerMinassian was the official responsible for devising and implementing such projects. Defendant realized the opportunity for DMJM, as he expressed in an email of September 19, 2001: "We [DMJM] are poised to increase our contract value and don't want to let issues get in the way of this contract, or upcoming opportunities to provide emergency support services. Right now, we are the only game in town and I want to keep it that way." *See* Email from Kenneth Keitt, September 19, 2001.

In an effort to promote this agenda, less than two weeks after this email, Defendant and other DMJM executives met with DerMinassian in Washington D.C. to pitch DMJM's capabilities in providing emergency services. Defendant was specifically lobbying DerMinassian to award the work to DMJM by "supplementing [DMJM's operational support] contract rather than [through] traditional procurement." *See* Email from Kenneth Keitt, September 24, 2001. Defendant's lobbying efforts on this score paid off: the DC DOT ultimately decided not to put out a competitive bid for the CCTV work and instead, awarded the CCTV work to DMJM in the form of a $3.5 million supplement to the operational support contract. Supplement to D.C. Formal Agreement No. 014-98 (Mar. 4, 2003).

DerMinassian's actions related to the operational support contract are quintessential "official acts," as described in *Valdes*. DerMinassian, like the hypothetical public official selecting a firm to supply submarines to the Navy, was responsible for

14

determining whether DMJM should receive a contract or benefit, and for how much. *Valdes*, 475 F.3d at 1325. Defendant targeted DerMinassian for these lobbying efforts precisely because DerMinassian's position within the DC DOT—specifically, his administration and control over the operational support contract—allowed him to make decisions on behalf of the DC DOT that could greatly benefit DMJM. These decisions related to the operational support contract are "official acts" that fit squarely within the statutory definition.

### E.    Proof of "For or Because Of"

The measure of intent required to find a defendant guilty of giving an illegal gratuity is that the thing of value was given "for or because of" the official act. *Sun-Diamond*, 526 U.S. at 404, *Schaffer*, 183 F.3d at 843. In *Sun-Diamond*, the Supreme Court held that, as its text suggests, 18 U.S.C. § 201(c) requires a link between the thing of value conferred upon a public official and a specific official act "for or because of" which it was given. 526 U.S. at 414. Gift-giving merely by dint of an individual's official position does not provide sufficient criminal intent to support a violation of the gratuities statute. "It is not a crime to give things of value to a public official merely to get cozy or in the hopes of inducing warm feelings toward the giver or the giver's employer." *Schaffer*, 183 F.3d at 840.

The magnitude of the necessary link between the thing of value and the official act, left ambiguous in *Sun-Diamond*, was explored by the D.C. Circuit in *Schaffer*. 183

F.3d at 840. The D.C. Circuit first observed that a gratuity "presumes a situation in which the offender gives the gift without attaching any strings." *Id.* at 841 (quoting *United States v. Mariano*, 983 F.2d 1150 (1st Cir. 1993)). That is, a thing of value given to a public official is a gratuity even if the official act "might have been done without the gratuity." *Id.* (quoting *United States v. Brewster*, 506 F.2d 62, 72 (D.C. Cir. 1974)). The Court took pains to point out that the measure of proof required to find intent—that the gratuity was given "for or because of" an official act—must be grounded in common sense:

> [H]uman beings rarely act for a single purpose alone. Rather, activity is more typically multi-causal, and directed toward achieving several rather than a single end[s]. Accordingly, we . . . focus instead on the more realistic and probative question of whether the acts in question were substantially, or in large part motivated by the requisite intent to influence the Secretary.

*Id.* at 843. The Court also acknowledged that "it may be near impossible to establish the requisite mens rea through direct evidence," and thus, in the absence of any specific statement or contemporaneous documentation of the defendant's subjective motivation, the trier of fact must "ascribe an intent on the basis of the circumstances surrounding the defendant's actions." *Id.*

The Court identified three possible permutations of a gratuity, noting that gratuities can either look forward or backward. *Id.* at 841-42. A gratuity can be a reward for past action. It can also be intended to entice a public official who has already staked out a position favorable to the giver to maintain that position. *Id.* at 842. Finally, a gratuity can

16

be given with the intent to induce a public official to propose, take, or shy away from some future official act. *Id.* This third category would "additionally encompass gifts given in the hope that, when particular official actions move to the forefront, the public official will listen hard to, and hopefully be swayed by, the giver's proposals, suggestions, and/or concerns." *Id.* As applied to the facts before it, the Court found that Schaffer had not violated the gratuities statute because the gifts in question were given to the Secretary *prior* to an outbreak of *E. coli*, which only then prompted official action Schaffer would have had reason to influence. *Id.* at 844.

Subsequently, in *Ahn*, the D.C. Circuit applied *Schaffer* to uphold the guilty plea of a police officer, Ahn, who received money from various massage parlors for or because of his failure to report their code violations. 231 F.3d at 33. Although the factual basis for Ahn's guilty plea did not explicitly link the payments to his failure to report violations, the Court held that "the only conclusion that can be drawn from the proffer is that while Lieutenant Ahn received payments . . . , the massage parlors continued to engage in illegal conduct and Ahn failed to take any 'immediate and proper police action.'" *Id.* at 32. *Ahn*, thus, provides a concrete example of the "common sense" approach to intent espoused in *Schaffer*. 183 F.3d at 843; *see also United States v. Campbell*, 684 F.2d 141, 149-50 (D.C. Cir. 1982) (rejecting the "startling" claim that a judge's gratuity conviction, paid for or because of his leniency in administering traffic citations, should be overturned for failure to tie the gift to a specific instance of leniency).

17

In this case, the United States will prove through direct, contemporaneous evidence as well as the surrounding circumstances, that Defendant had the requisite intent to give a thing of value to DerMinassian for or because of his official acts related to the operational support contract. In the immediate aftermath of September 11, Defendant sensed opportunity for DMJM. The DC DOT was set to receive tens of millions of dollars for new emergency traffic services projects, and Defendant realized by virtue of DMJM's operational support contract that it was the firm best situated to provide these services. As noted above, Defendant underscored the point in his September 19, 2001, email, highlighting DMJM's "upcoming opportunities" and position to "increase [its] contract value" under the operational support contract. Immediately thereafter, Defendant hastened his boss, Ira Levy, to Washington for a brainstorming session with DerMinassian about the emergency traffic capabilities of DMJM, and efforts to tie the DC DOT's emergency response system to the operational support contract.

Ultimately, because of these opportunities awaiting DMJM, when, on October 2, 2001, DerMinassian called Defendant and asked him for money to cover personal expenses, Defendant took care of it by seeing that DerMinassian got the money he wanted. When DerMinassian called three weeks later again asking for money, Defendant again took care of it, again directing his subordinate to give DerMinassian a cash payment. Finally, when DerMinassian called Defendant to settle the debt once and for all, Defendant discharged it as to DerMinassian. Defendant did not give money to

DerMinassian merely by dint of his official position within the DC DOT; instead, Defendant authorized money to DerMinassian based on his control over the operational support contract, including his authority over the discretionary year extensions and his control over increasing the contract's value to include the emergency traffic services demanded in response to the September 11 attacks.  Not surprisingly, DMJM was, in fact, awarded additional emergency traffic services work as part of its operational support contract.

## IV.    EVIDENTIARY ISSUES

### A.    Background Evidence is Admissible

The Indictment charges that DMJM's contract was awarded in September 2000 and that the illegal gratuity occurred "[d]uring the period October 2001 until in or about December 2001."  At trial, the United States will offer background evidence relating to events that took place before October 2001, setting the stage for the charged gratuity. The law is well-settled that in proving a criminal conspiracy and its purposes, the United States should be given wide latitude to introduce "background evidence" of acts and declarations occurring prior to the period charged in the Indictment.  *United States v. Morrow*, 2005 WL 3159572, *6 (D.D.C. 2005) ("Courts have allowed prosecutors wide latitude in admitting extrinsic background evidence to show association in a criminal conspiracy."); *United States v. Salameh*, 152 F.3d 88, 111 (2d Cir. 1998) ("[E]vidence that provides background information necessary to the jury's understanding of the nature

19

of the conspiratorial agreement properly is admitted 'to furnish an explanation of the understanding or intent with which certain acts were performed.'") (quoting *United States v. Daly*, 842 F.2d 1380, 1388 (2d Cir. 1988)). Likewise in this case, background evidence should be admitted with "wide latitude" to show, for example, a meeting of the minds, or the intent to influence and be influenced. *Morrow*, 2005 WL 3159572 at *6.

The United States may, for example, seek to introduce evidence of the longstanding professional relationship between DerMinassian and Defendant, or of the award and prior performance of DMJM's operational support contract with the DC DOT. This evidence will be essential for the jury to evaluate the events surrounding the charged conduct in and after October 2001. Notwithstanding the wide latitude afforded this Court in introducing background evidence, the United States anticipates offering only information closely related to the charged conduct and necessary for the jury to place the events in context.

### B.    Witness Testimony

#### i.    A Witness May Testify to Knowledge and Intent of Others

Lay witnesses are unassailably permitted to testify to their opinions and inferences, subject to certain explicit limitations. Fed. R. Evid. 701. As long as a lay witness's opinions or inferences are "(a) rationally based on the perception of the witness" and "(b) helpful to . . . the determination of a fact in issue," the witness may testify to those opinions. The D.C. Circuit has held that "under Federal Rule of Evidence 701, an

eyewitness may express an informed opinion that would help resolve a fact in issue." *United States v. Valdez-Torres*, 108 F.3d 385, 388 (D.C. Cir. 1997) (allowing lay witnesses to testify to the defendant's intent) (citing *Virgin Islands v. Knight*, 989 F.2d 619, 629-30 (3d Cir. 1993) (holding that lay witness to shooting with "firsthand knowledge of the factual predicates that form the basis for the opinion" may express opinion whether shooting was intentional or accidental) and *United States v. Juvenile Male*, 864 F.2d 641, 647 (9th Cir.1988) (holding that victim may offer his opinion of assailant's intent)).

In *Valdez-Torres*, a government witness testified, in a prosecution for assault, that the defendant hit him with his car. *Id.* at 386. Based on the witness's first-hand account of the incident, he concluded that the defendant intended to hit him and, consequently, to do him bodily harm. *Id.* at 388. The defendant challenged this testimony, but on appeal the court upheld its admission—noting that the witness's opinion helped to resolve the factual question of the defendant's intent. *Id.*; *see also Williams Enterprises, Inc. v. Sherman R. Smoot Co.*, 938 F.2d 230 (D.C. Cir. 1991) (allowing testimony of lay witness's opinion regarding the cause of damages). Opinions regarding motives and intent of others are within a witness's personal knowledge, and therefore within the confines of Federal Rule of Evidence 602, provided that the witness bases those opinions on his own perceptions. *See, e.g., Valdez-Torres*, 108 F.3d at 388; Fed. R. Evid. 701.

21

ii.     **Admissions and Statements Against Interest**

The United States intends to introduce testimony regarding non-hearsay out-of-court statements made by Defendant.  For example, the United States anticipates that DerMinassian will testify to Defendant's statements during phone calls between DerMinassian and Defendant in October 2001.  These statements are not hearsay according to Federal Rule of Evidence 801(d)(1) and (2), which explicitly exempts the witness's own statements as well as statements "offered against a party" which are "the party's own statement."  Since Defendant's out-of-court statements will be offered against him to prove his commission of a crime, they are not hearsay and are thus admissible.  *United States v. Jordan*, 810 F.2d 262, 264 (D.C. Cir. 1987) (discussing the admission of an out-of-court conversation with the defendant and finding that the defendant's "own incriminating statements were, of course, party admissions, and therefore not hearsay").

iii.     **Prior Inconsistent Statements as Substantive or Impeachment Evidence**

Rule 801(d)(1)(A) of the Federal Rules of Evidence provides that a prior inconsistent statement of a witness who testifies at trial and is subject to cross-examination concerning the statement is not hearsay if the statement is was given under oath at a trial, hearing, or other proceeding, or in a deposition.  Grand jury testimony is therefore admissible as substantive evidence at trial if it is inconsistent with the witness's

22

trial testimony.  *United States v. Gerry*, 515 F.2d 130, 141 (2d Cir. 1975); *United States v. Distler*, 671 F.2d 954, 958 (6th Cir. 1981) (upholding the constitutionality of Fed. R. Evid. 801(d)(1)(A) as applied to grand jury testimony).  The contradiction need not be explicit.  Thus, prior statements are admissible where the witness's testimony at trial is evasive.  *United States v. Morgan*, 555 F.2d 238, 241 (9th Cir. 1977).  They are also admissible where the trial witness denies knowledge of or suffers a failure of recollection with respect to the matter at issue.  *United States v. Milton*, 8 F.3d 39, 47 (D.C. Cir. 1993); *see also United States v. Klein*, 488 F.2d 481, 483 (2d Cir. 1973).  As the Second Circuit has noted, "it is immaterial whether the reason for the witness's denial of knowledge on the second appearance is fear[,] . . . a desire to help the defense, . . . or an honest lapse of memory in the interval."  *Klein*, 488 F.2d at 483 (citations omitted); *see also Distler*, 671 F.2d at 958 (holding that a partial or vague recollection is inconsistent with total or definite recollection for purposes of Fed. R. Evid. 801(d)(1)(A), and that corroborative portions of the prior statement are admissible to put the contradictory portions in context).

Of course, a prior inconsistent statement made by a testifying witness, whether sworn or unsworn, can be introduced as impeachment, rather than substantive, evidence. *See*, *e.g.*, *United States v. Stock*, 948 F.2d 1299, 1301 (D.C. Cir. 1991) ("One may impeach a witness by asking him about prior inconsistent statements.").

### v.    Prior Consistent Statements

Federal Rule of Evidence 801(d)(1)(B) provides that a prior consistent statement

of a witness is admissible as substantive evidence when it is offered to rebut an express or

implied charge against that witness of recent fabrication or improper influence or motive.

*See Gaines v. Walker*, 986 F.2d 1438, 1445 (D.C. Cir. 1993) (noting that "'there need be

only a suggestion' that witness consciously altered testimony to allow prior consistent

statement into evidence," quoting *United States v. Casoni*, 950 F.2d 893, 904 (3d Cir.

1991)).  The trial judge is accorded great discretion in determining the admissibility of

evidence under this rule.  *United States v. Zito*, 467 F.2d 1401, 1404 (2d Cir. 1972); *see

also United States v. Hamilton*, 689 F.2d 1262, 1273 (6th Cir. 1982).

Prior consistent statements are generally admissible even if made after the alleged

inconsistent statement.  *See United States v. Stover*, 329 F.3d 859, 867 (D.C. Cir. 2003).

In this circumstance, however, the statement is introduced not as substantive evidence,

but for rehabilitation of the witness following cross-examination.  *Id.* ("These prior

statements would not be offered for the truth of the matter asserted . . . and therefore

would not need to satisfy Rule 801(d)(1)(B).  They would be introduced to show that the

witness did not give statements on direct that were inconsistent with what he had said

before.").  The statement sought to be admitted must have a probative value that bears on

credibility beyond merely showing repetition; for instance, where the prior statement casts

doubt on whether the prior inconsistent statement was in fact made or whether the

impeaching statement is actually inconsistent with the trial testimony.  *United States v. Pierre*, 781 F.2d 329, 333-34 (2d Cir. 1986).  A prior consistent statement may also be introduced to amplify or clarify an allegedly inconsistent statement.  *Id*.

### vi.    Admissibility of Plea Agreement

A guilty plea made by a witness at trial is admissible.  As the D.C. Circuit has said, "[a] government witness' guilty plea obviously may not be used as substantive evidence of the guilt of defendants, but the plea is equally obviously admissible to show the witness' acknowledgment of his role in the offense and to reflect on his credibility." *United States v. Tarantino*, 846 F.2d 1384, 1404-05 (D.C. Cir.1988); *see also United States v. Brown*, 508 F.3d 1066, 1073 (D.C. Cir. 2007).  The United States may seek to introduce Wilhelm DerMinassian's guilty plea to demonstrate his acknowledgment of his role in the conduct at issue in the charged gratuity count.  That plea agreement is therefore admissible at Defendant's trial.  *Tarantino*, 846 F.2d at 1405.

### vii.   Attacks on Credibility

Federal Rule of Evidence 602 requires that a witness have personal knowledge of the matters about which he testifies.  The Rule does not, however,  require that the witness's recollection be perfect or certain.  *United States v. Evans*, 484 F.2d 1178, 1181 (2d Cir. 1973); *Flintkote Co. v. Lysfjord*, 246 F.2d 368, 383 n.16 (9th Cir. 1957).  All that is required for the testimony to be admissible is some evidence to support a finding that the witness observed or had an opportunity to observe the matters about which he

testifies. *Evans*, 484 F.2d at 1181. The standard which Rule 602 sets is a liberal one. As

McCormick notes:

> While the law demands firsthand observation, it is not so
> impractical as to insist on either precise attention by the
> witness or certainty in recalling the facts. Accordingly, even
> when a witness uses such qualifications as "I think," "My
> impression is," or "In my opinion," the testimony is
> admissible if he merely is acknowledging an inattentive
> observation or an unsure memory.

K.S. Broun, *McCormick on Evidence* § 10, at 50 (6th ed. 2006) (citations and footnotes

omitted). Put another way, "The judge should admit the testimony if the jury could find

that the witness perceived the event to which he is testifying, since credibility is a matter

for the jury." 3 J. Weinstein et al., *Weinstein's Evidence* § 602[02], at 602-11 (1993); *see

also Virgin Islands v. Knight*, 989 F.2d at 630 ("The relaxation of the standards governing

the admissibility of [lay] opinion testimony relies on cross-examination to reveal any

weaknesses in the witness' conclusions."); *United States v. Nimmo*, 380 F.2d 10, 11-12

(4th Cir. 1967). Testimony based on imperfect recollection is admissible over objection

that it is "opinion" or "speculation" whenever the witness either observed or participated

in what he is testifying about. *See* Fed. R. Evid. 701.

In this case, where the United States will call upon witnesses to testify as to

matters they personally observed, imperfect recollection or lack of definitiveness is not

cause for the exclusion of that testimony. Witnesses called by the United States will be

testifying about events that occurred over six years ago. They may qualify their testimony

26

by such expressions as "I think," "I believe" or "to the best of my recollection." These prosecution witnesses are likely not always going to be able to specify the exact dates of particular communications in which they engaged, or specifically recall when in a conversation a particular statement was made. The witnesses may have only a general recollection of some conversations. Such testimony is admissible over objection that it is not based upon the witness's personal knowledge.

### viii.    Character Evidence

The United States anticipates that Defendant may seek to introduce evidence at trial of his good character. Federal Rule of Evidence 404(a)(1) allows an exception to the general prohibition on character evidence when a criminal defendant introduces evidence of "a pertinent trait of character." As the D.C. Circuit has noted, "while a criminal defendant can put character in issue, the evidence can concern only a 'pertinent trait of character,' and even then may be excluded if 'its probative value is substantially out-weighed by the danger of unfair prejudice.'" *United States v. Harris*, 491 F.3d 440, 447 (D.C. Cir. 2007) (citations omitted).

The general trait of "law-abidingness" is pertinent to almost all criminal offenses. *In re Sealed Case*, 352 F.3d 409, 412 (D.C. Cir. 2003). Other traits, however, including the defendant's tendency toward truth and veracity, are admissible only when those characteristics have been specifically placed in dispute—when, for example, fraud or falsehood is one of the statutory elements of the crime charged, or when the defendant

testifies and his credibility is attacked by the prosecution. *Id.* This "pertinence" requirement leads to the exclusion of evidence in many circumstances, such as where a defendant police officer sought to introduce evidence of his "dedication, aggressiveness and assertiveness" in his job, *United States v. Washington*, 106 F.3d 983, 999 (D.C. Cir. 1997) (finding these character traits not pertinent to charges of conspiracy, attempted possession of cocaine with intent to distribute, and weapons offenses), or "bravery, attention to duty, perhaps community spirit," *United States v. Nazzaro*, 889 F.2d 1158, 1168 (1st Cir.1989) (finding the characteristic not pertinent to charges of perjury and conspiracy to commit mail fraud). A defendant cannot introduce character evidence simply to show that he is "a nice person." *United States v. Wiggins*, 946 F.2d 1567, *1 (D.C. Cir. 1991) (unpublished).

Should a defendant introduce such evidence of his own good character, the government is then permitted to rebut those claims with evidence of its own. *See* Fed. R. Evid. 404(a)(1). "After all, '[t]he price a defendant must pay for attempting to prove his good name is to throw open the entire subject which the law has kept closed for his benefit and to make himself vulnerable where the law otherwise shields him.'" *United States v. James*, 555 F.2d 992, 997 (D.C. Cir. 1977) (quoting *Michelson v. United States*, 335 U.S. 469, 479 (1948)).

Here, Defendant is charged with one count of giving an illegal gratuity. That charge requires proof of three elements: that the defendant (1) gave a thing of value (2) to

a public official (3) for or because of any official act performed or to be performed by

such public official. *Schaffer*, 183 F.3d at 840. Traits like truthfulness and veracity,

community involvement, or dedication to a job are simply not pertinent to the limited

charge at issue. Defendant is thus limited to the introduction of evidence pertinent to the

elements of the offense, subject to the restrictions of Rule 403 on cumulative evidence

and open to rebuttal by the United States.[5]

### C.    Admissibility of Documents and Business Records

The United States and Defendant have agreed, with limited exceptions, to stipulate

to the authenticity and business record character of documents the parties intend to

introduce at trial. These records, then, satisfy the requirement of authentication laid out

in Federal Rule of Evidence 901(a), and neither party will require certifications of

authenticity pursuant to Federal Rule of Evidence 902(11) or other means of self-

authentication. Moreover, business records, defined in Federal Rule of Evidence 803(6)

as "records of a regularly conducted business activity," are an exception to the hearsay

---

[5] A defense witness's opinion of a defendant's character and reputation is admissible notwithstanding the restrictions on lay opinions set forth in Federal Rule of Evidence 701. Fed. R. Evid. 405(a); *see Wiggins* 946 F.2d at *2. A witness, however, may not testify regarding specific instances of conduct unless that testimony is given during cross-examination or when the defendant's character is "an essential element of a charge, claim, or defense." Fed. R. Evid. 405(b). Moreover, while there is no strict limit to the number of witnesses a defendant may call, the introduction of character evidence is subject to exclusion "by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403; *see In re Sealed Case*, 352 F.3d 409, 414 (D.C. Cir. 2003) (finding testimony of second proffered character witness would be cumulative).

rule. The documentary evidence thus stipulated should therefore be considered authentic non-hearsay records.[6]

Should the authenticity of a document not stipulated by the parties come into dispute, the moving party can authenticate the document in many ways, including by testimony from a percipient witness and by the face of the document itself. Fed. R. Evid. 901(b), 902. Evidence of authentication may include hearsay and other evidence normally inadmissible at trial, *see United States v. Franco*, 874 F.2d 1136, 1139 (7th Cir. 1989), and may be either direct or circumstantial. *United States v. Parker*, 749 F.2d 628, 633 (11th Cir. 1984). Once the proponent of the evidence makes out a prima facie showing of its authenticity, the evidence should be submitted to the jurors for consideration of its authenticity. The burden then shifts to the opponent of the evidence to convince the jury that the evidence is not authentic. *See United States v. Caldwell*, 776 F.2d 989, 1003 (11th Cir. 1985) ("Rule 901 . . . makes the court's determination of authenticity merely a preliminary evaluation and leaves the ultimate decision on genuineness to the jury.").

---

[6] The parties have not stipulated to the ultimate admissibility of these records, however, and the United States respectfully reserves any objection to Defendant's documentary evidence on other grounds. For example, the United States may object to Defendant's offer of evidence on the ground that it is irrelevant, unfairly prejudicial, confusing, misleading to the jury, or unnecessarily cumulative. Fed. R. Evid. 402 and 403.

Dated this 16th day of May, 2008.

Respectfully submitted,

_____/s/_____

EMILY W. ALLEN
JOHN F. TERZAKEN III (D.C. Bar # 474015)
MARK W. PLETCHER
Trial Attorneys, Antitrust Division
U.S. Department of Justice
450 5th Street, N.W., 11th Floor
Washington, D.C.  20530
Telephone: (202) 307-0946
Facsimile:   (202) 514-6525
E-mail:  john.terzaken@usdoj.gov
         mark.pletcher@usdoj.gov
         emily.allen@usdoj.gov

31

# ATTACHMENT A

## WITNESS LIST OF THE UNITED STATES

1.   Wilhelm DerMinassian
     505 Silver King Lane
     Rockville, Maryland

     Attorney:     Mark E. Schamel, Esq.
                   Schertler & Ornorato, LLP
                   1140 Connecticut Ave., NW, Suite 1140
                   Washington, D.C.  20036
                   (202) 628-4199

2.   Robert Edelstein
     265 Northwest 119th Lane
     Coral Springs, Florida

     Attorney:     Sarah Kleven, Esq.
                   Sutherland, Asbill & Brennan LLP
                   1275 Pennsylvania Avenue, N.W.
                   Washington, D.C.  20004-2415
                   (202) 383-0361

3.   Ira Levy
     48 Carl Road
     Walpole, Massachusetts

     Attorney:     Sarah Kleven, Esq.
                   Sutherland, Asbill & Brennan LLP
                   1275 Pennsylvania Avenue, N.W.
                   Washington, D.C.  20004-2415
                   (202) 383-0361

4.   Michael Travers
     960 Ridgeway Drive
     Annapolis, Maryland

     Attorney:     Whitney Ellerman, Esq.
                   Hunton & Williams
                   1900 K Street, NW

Washington, D.C.  20006
(202) 955-1688

5.       Stephanie Travers
         960 Ridgeway Drive
         Annapolis, Maryland

         Attorney:      Whitney Ellerman, Esq.
                        Hunton & Williams
                        1900 K Street, NW
                        Washington, D.C.  20006
                        (202) 955-1688

# ATTACHMENT B

## <u>EXHIBIT LIST OF THE UNITED STATES</u>

| GOV. EX. NO. | DESCRIPTION | BATES NO. |
|---|---|---|
| 1 | Trial Immunity Order for Robert Edelstein | |
| 2 | Grand Jury Immunity Order for Robert Edelstein | |
| 3 | D.C. Formal Agreement No. 014-98 | DHDOJ0007507-562 |
| 4 | 11/19/2001 DMJM+ Harris ITS Division October Monthly Management Letter | DHDOJ0046694-701 |
| 5 | DMJM + Harris DC Operational Support Organization – August 22, 2003 | DHDOJ0012329 |
| 6 | 9/28/2001 Letter from DC Department of Public Works | DHDOJ0007596 |
| 7 | 9/24/2001 Email from Kenneth Keitt | DHDOJ0052982 |
| 8 | 9/25/2002 Government of the District of Columbia Change Order / Unilateral Modification | DHDOJ0043572-573 |
| 9 | 10/2002 Performance Review of Kenneth Keitt | DHDOJ0016702-703 |
| 10 | 8/26/2002 Email from Kenneth Keitt | DHDOJ0044094 |
| 11 | 11/2003 Performance Review of Kenneth Keitt | DHDOJ0016674-677 |
| 12 | Trial Immunity Order for Ira Levy | |
| 13 | Grand Jury Immunity Order for Ira Levy | |
| 14 | DMJM + Harris Code of Conduct | DHDOJ0044063-90 |

| GOV. EX. NO. | DESCRIPTION | BATES NO. |
|---|---|---|
| 15 | Calendar of Ira Levy | DHDOJ0046825-826 |
| 16 | Plea Agreement of Wilhelm DerMinassian | |
| 17 | 9/10/2001 Request and Authorization for Official Travel | DCDOT-011-00000980-994 |
| 18 | 10/2001 Department of Transportation Credit Card Statement | DCDOT-011-00001517-525 |
| 19 | 10/17/2001 Request and Authorization for Official Travel | DCDOT-011-00000995-1014 |
| 20 | 11/2001 Department of Transportation Credit Card Statement | DCDOT-011-00001319-321 |
| 21 | Plea Agreement of Dunn Engineering Associates | |
| 22 | Trial Immunity Order for Michael Travers | |
| 23 | Grand Jury Immunity Order for Michael Travers | |
| 24 | 9/19/2001 Email from Kenneth Keitt | DHDOJ0054424 |
| 25 | 10/2001 Credit Card Statement of Michael Travers | T0001 |
| 26 | 11/2001 Credit Card Statement of Michael Travers | T0002 |
| 27 | Credit Card Advance Receipts of Michael Travers | T0003 |
| 28 | 10/2001 Bank Annapolis Withdrawl Receipt | T0004 |
| 29 | TMC Telephone List – DMJM + Harris, Inc. | DHDOJ0012015 |

| GOV. EX. NO. | DESCRIPTION | BATES NO. |
|---|---|---|
| 30 | 10/7/2001 Nextel Phone Record Statements of Federick R. Harris, Inc. | DHDOJ0001811-886 |
| 31 | 11/6/2001 Nextel Phone Record Statements of Federick R. Harris, Inc. | DHDOJ0001642-709 |
| 32 | 1/29/2004 Letter Terminating Kenneth Keitt | DHDOJ0016670-673 |
| 33 | DMJM Affidavit of Compliance | |
| 34 | 3/4/2003 Letter from DC Department of Transportation | DCDOT-009-00001069 |
| 35 | Supplement to D.C. Formal Agreement No. 014-98 | DCDOT-00900001014-1027 |
| 36 | 11/19/2001 ITS Monthly Operating Report FY'02 / FM October | DHDOJ0046690-693 |
| 37 | 01/11/2002 DC Department of Public Works Memorandum | DCDOT-011-00001323-349 |
| 38 | Change Order No. 2 – D.C. Formal Agreement 014-98 | DCDOT-009-00000781-782 |
| 39 | Change Order No. 3 – D.C. Formal Agreement 014-98 | DCDOT-009-00000623-624 |
| 40 | Change Order No. 4 – D.C. Formal Agreement 014-98 | DCDOT-009-00000455 |
| 41 | 2/14/2000 Memorandum from Bob Edelstein | DHDOJ0046304-308 |
| 42 | 4/15/2002 Memorandum from Kenneth Keitt | DHDOJ0044099 |
| 43 | 6/4/2002 Memorandum from Kenneth Keitt | DHDOJ0055163 |
| 44 | 7/2/2002 Memorandum from Kenneth Keitt | DHDOJ0055172 |

| GOV. EX. NO. | DESCRIPTION | BATES NO. |
|---|---|---|
| 45 | 7/26/2002 Memorandum from Kenneth Keitt | DHDOJ0044114 |
| 46 | 9/13/2002 Memorandum from Kenneth Keitt | DHDOJ0044109 |
| 47 | 10/29/2002 Memorandum from Kenneth Keitt | DHDOJ0055191 |
| 48 | 2/27/2003 Memorandum from Kenneth Keitt | DHDOJ0044106 |
| 49 | 9/25/2002 Government of the District of Columbia Change Order / Unilateral Modification | DCDOT-002-00000556-557 |
| 50 | 6/21/2002 Record of Authorization to Proceed with Contract Revision | DCDOT-009-00001062 |
| 51 | 11/30/2001 Performance Review of Michael Travers | DHDOJ0017657 |
| 52 | 4/17/2002 Request for Payment; D.C. Formal Agreement No. 014-98 | DCDOT-002-00003456-576 |
| 53 | Statute of Limitations Tolling Agreements between the United States and Kenneth Keitt | |
| 54 | Grand Jury Testimony of Wilhelm DerMinassian | |
| 55 | 4/21/2005 Transcript of Wilhelm DerMinassian Plea Hearing | |
| 56 | Grand Jury Testimony of Robert Edelstein | |
| 57 | Grand Jury Testimony of Ira Levy | |
| 58 | Grand Jury Testimony of Michael Travers | |

| GOV. EX. NO. | DESCRIPTION | BATES NO. |
|---|---|---|
| **59** | (Intentionally Blank) | |
| **60** | (Intentionally Blank) | |

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 16th day of May, 2008, the foregoing TRIAL

MEMORANDUM OF THE UNITED STATES, was filed electronically and to the best

of my knowledge, information and belief, counsel for defendant Kenneth Keitt will be

notified through the Electronic Case Filing System.


_____/s/_____

EMILY W. ALLEN
Trial Attorney, Antitrust Division
U.S. Department of Justice
450 5th Street, N.W., 11th Floor
Washington, D.C.  20530
Telephone:  (202) 307-0946
Facsimile:   (202) 514-6525
E-mail: emily.allen@usdoj.gov